Good morning. I'd like to reserve three minutes for rebuttal. May it please the court, my name is Lauren Coatney from the law firm of McManus Faulkner. Joined with me at council table is Hilary Waddell. Also present in the courtroom is my client, Dr. Robert Beddinger. I'm here today representing appellants, University of California professors Dr. Timothy White, Dr. Robert Beddinger, and Dr. Margaret Schoendrink. There are several grounds on which the district court's dismissal of appellant's complaint can be reversed. But because Rule 19 is at its heart a rule of equity, I'd like to begin with what's at stake if this case remains dismissed. Two 9,000-year-old human skeletons that are some of the most well-preserved ancient human remains ever discovered on this continent and which present a unique opportunity for all people to learn about the origins of humanity in North America will be lost forever. The University of California's decision to dispose of these remains will go unchallenged and unreviewed, despite strong opposition of many in its own faculty. Let me ask you a question about your clients, White, Schoendrink, and Beddinger. What's their relationship to the university? They're professors of the university. Professor Beddinger works at University of California Davis. I believe Dr. White is associated with Berkeley and Dr. White. They're all employees of the university? Yes, they are. Were they involved in the archaeological dig at all? They were not. They were not involved in the original dig. Gail Kennedy led the dig? Yes. And who is she? She was an employee at the time, and she was leading a student program to do an archaeological dig at the university house, which is where the remains were discovered. What departments were your clients in? Professor White is with the Department of Integrated Biology, and Dr. Beddinger and Dr. Schoendrink are with the Anthropology Department. Are they chairs of any departments? Not that I'm aware of. Did they make the policy that you refer to in your arguments about studying various things? That I don't know, Your Honor. Are they policy makers? I don't have an answer to that question. To whom did they request permission to examine these remains? They requested the chancellor of the university that normally would grant these types of requests. It's a research position within the university. And that was turned down? Yes. Why did they ask for permission? Because they didn't have access to the remains themselves. They had to ask permission to be able to study the remains. So they need permission from the university to do this? Yes. And the university then, I suppose, has discretion to turn it down, as happened in this case? The university has discretion to turn it down under its policies. However, there's no facts in this particular case that would indicate why these highly qualified professors would be turned down for research that relates directly to their field. Well, how have they been injured in the sense that we talk about that in the standing context? They certainly have been deprived of the opportunity to examine these things. But they need permission from the university to do this. And they are simply employees. Even if the remains were to stay at the university, what showing is there that they would necessarily have the right to examine these remains? Your Honor, under the university's human remains policy, remains and artifacts that are held by the university are generally granted. Well, you see, there you go. You say, first of all, it's a policy. It doesn't have the force of law. Second of all, you say they generally would be granted permission. I mean, who knows that these remains could be sent to somebody else in the university for examination? And could not your clients be excluded without any problem at all from being able to examine these things if they were given to other archaeology professors or whomever? That's certainly possible. It's possible. So how do your clients, it's not clear to me that your clients as employees, not policymakers, not department chairs, not having any right to examine these things, how have they suffered an injury in the standing sense? This is the issue obviously raised by appellees regarding the redressability of our clients' injury. And I think in this case, it's very similar to the case in Bonnachson, where this court held that if the Army Corps of Engineers were required to retain the remains of the Kennewick Man, it would likely be that the plaintiffs in that case would be permitted to study those remains. And who were the plaintiffs? In the Kennewick Man, they were scientists. And in particular, one thing that appellee distinguishes this case from Bonnachson is that there was an ARPA, an Archaeological Resources Protective Act, permit in that case that allowed for the excavation of the remains. However, the reason that the court ---- Isn't that substantially different from the situation in this case? It's not, Your Honor, because in that court ---- in that case, the court found that although there was this permit, the permit was only related to the excavation of the remains, not permitting the study of the remains. And in fact, the plaintiffs in that case were not listed on the excavation permit. They were other scientists that just would have liked to have the opportunity to study the remains. And in that case, the court found that the plaintiff's injury was redressable, similar to this case where under the normal course of events, under the university's policies, professors and scientists like our clients would be granted access to these remains. And there's really no facts to suggest otherwise, except that the university has promised these remains to the Native Americans in this case. So let's just play this through. So if NAGPRA doesn't apply, let's just say that happens and it's found that NAGPRA doesn't apply, the university then does what according to its policy? According to its policy, the university still holds the remains for the benefit of the public in a public trust that was established in the California Constitution. So in that circumstance, if NAGPRA doesn't apply, the university would go through the normal process of looking at the request of our clients to study the remains, making their determination under the policy, but ultimately making the decision that reflects the best interests of the people of California. Would your clients have any right to compel the opportunity to examine these remains from the university? Not under the policy as it is written, but there may be internal policies that aren't developed in the record yet because there have been no discovery. And a lot of these issues would be fleshed out more in discovery on the merits of this claim. But presumably the university has some sort of procedure whereby our clients could suggest... Well, presumably we don't know that for sure, but they could easily exclude these people and say, well, we're just not going to grant your request, goodbye. That's possible, but in this case there's no facts to suggest why the university would do that, except perhaps in retaliation for... Well, they already turned it down once. They turned it down because the remains had already been promised to the Native Americans. So the factual nexus there is not because our clients weren't entitled to it for any sort of academic or scientific reason. It was merely because the remains had already been promised, and because the Native Americans in this case find it repugnant to have any further study of the remains done. So is there any particular provision in the policy that tips redressability in favor of your client? The fact that the policy states that these type of remains held by the university are open generally for study indicates in this instance that the professors would have the ability to study the remains if they were not given to the Native Americans. So why don't you get to the Rule 19 issues? Sure. The district court recognized that plaintiff's challenge to the disposition of the remains was what Congress intended when it enacted NAGPRA, and that dismissing plaintiff's complaint raises troubling questions about the availability of judicial review under NAGPRA and threatens the appellants and the public with profound harm in this case. Nevertheless, the district court held that it lacked discretion to consider the profound harm in light of the tribe's assertion of sovereign immunity, and that instead the district court was compelled to dismiss in this case. This rigid, inflexible approach to Rule 19 advocated by appellees and adopted by the district court is contrary to the plain language of Rule 19, conflicts with the precedent of this circuit, and works a substantial injustice in this case. Instead, this court should adopt a more balanced approach that looks at the equities of this case, similar to the approach taken by the Tenth Circuit in many Goatsby CLEP. How is it contrary to the language? The overarching purpose of Rule 19 requires to – requires the court to look at whether in equity and good conscience, and it lists four non-exclusive factors that the court must weigh in determining whether a case can proceed without an indispensable party. And the district court's ruling and the position advocated by appellees here would only have the court look at one factor, and that's the issue of sovereign immunity, as the determining cardinal factor in the Rule 19 analysis. That's a pretty big trump factor, isn't it, though? I mean, sovereign immunity stops lots of things right in their tracks. It does, but the analysis of Rule 19 is supposed to be fact-specific. It's a rule of equity. So you're asking for an interpretation that says even though we conclude there is sovereign immunity, nevertheless, we're just not going to let that rule the day. Yes, Your Honor. And of course, in this case, appellants also contest whether or not the tribes are entitled to sovereign immunity, but assume for the sake of argument right now that they are entitled to sovereign immunity, even with sovereign immunity in this case, this case can proceed in the absence of the tribe and KCRC. But it would extinguish their interest. Right. I'm sorry? If it proceeded in the tribe's absence, it would extinguish their interest without their participation. It would extinguish an interest that in this case is incredibly tenuous, because the interest asserted by the tribes in this case assumes that the NAGPRA applies and that the remains have been determined as Native American, a formal determination that was never made in this case. So in order for the tribes to have an interest in these remains, not only must they have been determined as Native American, which has not happened, but there must be the tribes have failed to make a showing that even though these remains are culturally unaffiliated, that by a preponderance of the evidence, they can receive these remains. So in what form would they make that claim? They would make that claim by how would they present the evidence or how would they I mean, if in fact they're not joined in this, how do they protect their interest? You're arguing that they haven't shown their case and say, well, you need to join us to make the case. So therefore, the logic is because we're sovereign, that's the end of the ballgame. If the university were required to make a formal determination as to whether the remains were in fact Native American, a determination they have failed to make thus far, they would have to go through the consultation process outlined in NAGPRA, which would necessarily include consultation with the tribes. And the tribes have previous to this been involved in providing evidence to the university, evidence that was ultimately determined not to be conclusive as to cultural affiliation. But the tribes would still be able to be involved in the underlying process of the determination as to whether the remains were Native American. So they would have a voice in that sense. The district court looked at this as a property dispute in which each party, I guess, has conflicting ownership interests. But was that, is that what we have here as a property dispute? No, Your Honor, because there really is no interest. This is unlike other cases in which the tribes have a contractual interest or they have a property interest. In this case, their only interest in these remains comes from the legally erroneous notice of inventory completion completed by the University of California without making first a determination as to whether the remains are Native American. So in this case, the interests of the tribe are less substantial than in other cases that find that sovereign immunity may outweigh other factors. Because in this case, there has been no determination that the tribes, in fact, have an interest here. So if we're, if we, if the question then is whether NAGPRA applies or does not apply, what are the conflicting interests in the proper application of the law? I mean, how does the tribe not have an interest in arguing and being present for the sake of saying that NAGPRA does apply? Well, the, as I previously stated, the tribes would be able to be involved in the consultation with the university to determine whether or not the remains are Native American, which is the turning, the ultimate factor as to whether NAGPRA applies. And it's a process that the tribes have previously been involved in and would presumably continue to be involved in if the university was required to make a determination. Now, of course, the tribes could join this case. And although that's not necessarily something that this court under Rule 19 precedent is to consider, the tribes have been involved previously in presenting evidence to the university. The university has determined that that evidence is not sufficient to determine cultural affiliation and therefore has proceeded under the assumption that the remains are not culturally affiliated. So if the university were required to make a formal determination as to whether the remains were Native American, the tribes would still have a voice even if they decided not to join in this case. Your first argument was this is inconsistent with the language of the statute. Your second is that it flies in the face of precedent. What precedent are you talking about that should enable you to win this argument? Sure. I see my time's almost up, and I'll answer Your Honor's question and then turn it over to opposing counsel. But appellees rely primarily on a recent Supreme Court case, Republic of the Philippines v. Pimentel, for the proposition that in that case, when it is determined that a party has sovereign immunity, the court must determine, in other words, lacks discretion to determine that the case can proceed without that party. And that argument states too much in Pimentel. Pimentel, in fact, says that the court is required to balance the equities and look at all of the factors. Although Pimentel ultimately came down on the side of the sovereign and determined that the case could not proceed without the sovereign, the court stated that the lower court must have looked at all of the factors. And in fact, one of the cardinal factors that the Supreme Court looked at was the availability of an alternative remedy for the plaintiffs. And in this case, there absolutely is no available alternative forum for the plaintiffs to redress their claims. Although the Supreme Court ultimately held that the case could not proceed without the sovereign, towards the end of the case, the Supreme Court stated that the balance of equities could change over time, and that if it became clear that there was no alternative forum to plaintiffs, that may shift the balance of the equities in favor of proceeding without the sovereign party. Thank you, counsel. Thank you. Good morning. May it please the Court. Mike Mongin on behalf of the University Defendants. I'll be arguing for the first 12 minutes of Appelli's time, and my colleague representing the KCRC will be arguing for the balance of our time. There are two independent grounds that each require affirmance of the district court's judgment. First, the district court lacked jurisdiction over plaintiffs' claims. And second, Rule 19 requires dismissal because the Kumeyaay tribes are necessary and indispensable parties who cannot be joined in light of their sovereign immunity from suit. And I'd like to begin by making three points responsive to Judge Trott's questions on the standing issue. The first point is that it is the case that if the remains were determined not to be Native American, and thus not subject to NAGPRA, the university would have substantial discretion over what to do with them. Okay. There we go with a qualifier. What does substantial mean? Well, Your Honor, I think that it means the sort of broad and legitimate discretion that the Court referred to in the Glanton case and the Mayfield case. And I would refer to the court to excerpts. Do you think, for example, the university could act arbitrarily and capriciously in making that decision? Well, Your Honor, I think that there may be legal checks on how the university goes about making its decisions, but I would refer the court to the excerpts, page 791, the first page of the university's human remains policy, which spells out in the first two paragraphs the principles that would apply to remains that are not covered by NAGPRA. And the first paragraph, I think, is crucial because it states that it recognizes that individuals and communities have cultural and religious concerns that must be considered in determining the treatment and disposition of remains. I think the use of the word disposition is important because that's a term of art in this area that refers to transfer to another entity. So I think it's clear that even if remains are not Native American, the university could consider concerns like those raised by the KCRC here. Right. But I think I understand that point, but the question is what remedy would the plaintiffs have if you turned them down? I mean, is there an avenue for appeal? Is there some check on it? I just don't understand the university's position on it. Well, Your Honor, I don't think that plaintiffs have pointed to any sort of legal check on the discretion. I'm asking you, as representing the university, what is their avenue of appeal from a denial of a request to examine the remains if they're determined to be non-Native American? Well, Your Honor, I think that I'm not sure that that's an issue that is addressed in the policies, but the president go ahead. Sorry. No. The policies do address that the president of the university has the ultimate decision on what to do in a situation like this. So it could be, for example, that they could write to the president and make their case, but I think that the point is for purposes of Article III, the only issue is that there is substantial and broad discretion on the part of the university. Doesn't paragraph 2 of the policy maybe tip this in the plaintiffs' favor? I'm just — and I don't know. It's a very interesting and I think kind of difficult question, but what's your read on paragraph 2? Yes, Your Honor. I think that paragraph 2 recognizes that in the decision-making process about what to do with non-Native American remains, one consideration is the potential for pedagogical and research value, and if the remains are decided to stay in the university's collection, then those considerations are in play as to how they should be treated. But I think the first paragraph does make clear that a disposition of the remains, such as a transfer to tribes who make a request for them, is well within the university's discretion. But does paragraph 1 not basically mean NAGPRA? If we're bound by NAGPRA, we need to do what we need to do, or you think it's broader than that? I think it is broader than that, Your Honor, because I think the first two paragraphs articulate the general principles, and then the third paragraph says the balance of these policies address, you know, essentially what happens when NAGPRA applies. So I think that the first two paragraphs would apply in both circumstances, including the hypothetical scenario where NAGPRA does not apply. The one other point that I'd like to make on this front is that ---- Well, let me ask you. Go ahead. Make your point. Well, I was just going to say that my friend referenced the Bonickson case, and I think that that is actually very instructive here. Because in Bonickson at the court held that neither appellant disputes that ARPA gives the plaintiff the opportunity to study the remains if NAGPRA does not apply. That's at 367 F. 3rd. 873. And in fact, the ARPA regulation, which is at 36 CFR section 79.10, says that remains quote, shall be made available to qualified professionals for study. And shall means shall. That's a zero standard term. I think that that's right, Your Honor, and that's probably why the parties didn't dispute the point in Bonickson. So I think ---- Right. But it's hard for me to believe in the university context that these are determined to be non-Native American remains so that the university would not allow qualified scientists to examine them who are faculty members. And I understand the discretion, but we're talking about Article III standing. I'm not, you know, whether they have a reasonable expectation that if there's a contrary determination that they would be able to examine the remains. Well, I think that this is a decision, to be clear, that the university hasn't made yet as to what it would do.  We're talking standing to make it. That's a ---- Well, I think this is very close to the situation addressed by the Supreme Court in the Estarco case, where it said that the problem when you have a policymaker that has broad and legitimate discretion over what to do, and that discretion controls redressability, is that courts aren't able to evaluate with any assurance the likelihood that decisions will be made in a certain way by that policymaker. And I think that's exactly the sort of situation that we have here. Except you do have competing interests that are spelled out in the policy, one of which is it would favor the plaintiffs. So, I mean, I think I understand your position on standing. I don't want to deter you from your other argument. Right, Your Honor. I guess let me just say, are you saying competing interests are not enough for standing? And if so, is that what you're saying Estarco says? I think that that's a fair reading of Estarco, because in Estarco you have the question of, you know, essentially what would become of these additional funds in the State coffers, and there are competing interests there. Some people were arguing that they should be used to pay greater benefits to teachers. The question was that the sort of dispositive issue in the Estarco opinion was that there was no way for a court to control the discretion of a policymaker as to what it would do with those funds and how that would affect redressability. So let me ask you this question. If these professors don't have standing, who does? Well, Your Honor, I think that, as we addressed in our briefs, the — Nobody. That's your answer, right? Well, I think that that is — I think that's correct, Your Honor. Does somebody have to have standing in every case? I don't think that they do, Your Honor. But I guess you're saying that we can't conclude, at least at this stage of the litigation, that the university applying its own policy would probably keep the remains for research, unless — if they didn't feel compelled by NACPRA. I don't think that plaintiffs have carried their burden of establishing redressability, and I don't think you could conclude that probability in light of the university's policies, which are attached as an exhibit to the complaint. Moreover, there's nothing showing that these professors would be the ones that would be allowed to do the research. I think that's exactly right. I mean, UCLA, San Diego Museum of — I mean, all these different institutions involved, maybe these — maybe they would say research, but there's absolutely nothing to suggest that these would be the people allowed to do it. That's right, Your Honor. Well, maybe we better move on from standing. Let me ask you. It seems like the issue that this litigation seeks to resolve, I think, is whether NACPRA applies to these remains. Do you agree with that? I think that that is the first claim raised by the plaintiffs in their suit, yes. Okay. And that seems to me like a question addressing the lawful application of the administrative procedures. And so I guess my question, getting into Rule 19, how are the tribes' interest in that question any different from any other parties? Well, Your Honor, I think that the tribes have a legal interest that would be impaired or impeded if this suit went forward, including the procedural arguments, because they presently have a legal entitlement to these remains by operation of the conclusion of the university that they're Native American and the regulation 43 CFR section 10.11c. Well, why can't the university adequately represent their interest? Well, Your Honor, this isn't — that's not a point that was argued by plaintiffs here, but it was argued below and rejected by the district court. And I think that this Court in Shermone set out the factors that's relevant to that adequate. And it was rejected by the district court, it appears, because the district court looked at this as a matter of ownership and who owns this. And I think it seems like in this litigation won't resolve who owns the remains, it's whether NAGPRA applies, correct? Well, Your Honor, I think if NAGPRA applies, then it is clear that the tribes are entitled to the remains. And so for that reason, I think that the tribes are — have stated a non-frivolous claim to the remains, which is what they — all that is necessary for them to have — to be a necessary party under Rule 19a. And I would want to point to, in response to your question about, you know, whether this is somehow different because there are procedural arguments raised here, I would note that I think this Court, in the MACA case and elsewhere, has recognized that where a plaintiff seeks to unwind a decision that has already been made, that gives an absent party a legal interest, that is barred by Rule 19. The argument about procedural relief being available in the MACA case, it was made clear that that applies only to prospective injunctive relief about future decisions that have not yet been made. Here, the plaintiffs are seeking to unwind a decision that gives a legal entitlement to the tribes. And in fact, in their relief, they request a permanent injunction forever barring the university from transferring the remains to the tribes. So I think it would do substantial prejudice to the tribes if this suit went forward outside of their presence and over their objection. Let me see if I understand the practical import of all this. If nobody has standing to challenge your NAGPRA decision, and the tribes can't be compelled to join, in fact, there's no review of the university's NAGPRA decision at all, is there? I don't think that that's right, Your Honor. Who would have the right to challenge that? Well, maybe as a matter of Article III suit, but it is clear that the Secretary has the authority to initiate a civil administrative process, to review a decision made by a museum, and to impose a civil penalty in an administrative proceeding. And so I think that there is a check on how museums and agencies act, even if there isn't Article III review. Does the Secretary, in your review, have the power to raise this by means of a preliminary injunction action? Or is it just civil penalty? Well, Your Honor, I think in the — I mean, I'm not arguing with you. I'm just trying to figure out, if someone objects to the university's NAGPRA decision and wants to adjoin the university from doing something, who possibly would have standing to do that, including the Secretary? I just don't — and if it's nobody, that's fine. I just want to try to unravel this from my own thinking. Well, I think that — and I want to make sure that my colleague has an opportunity to speak. I think that Section — 25 U.S.C. Section 3013 empowers any person to bring an action regarding NAGPRA, assuming that it meets the other justiciability requirements. And Congress was very clear here in the legislative history that it intended for that section to allow agencies to be able to bring suit. And we haven't briefed this, but the agency standing analysis is somewhat different than a suit brought by a private plaintiff. So it may well be that even on the facts we have here, a secretary could come in and enforce it in Article III court by bringing a suit under Section 3013. But at a minimum, the secretary would be able to institute a civil penalty proceeding. And by the way, the regulations allow any person to try and initiate such an administrative process by making a complaint to the secretary, and the secretary is required to respond to that complaint. I have one other question for you. Why wouldn't the public rights exception apply in this case? I think that the public rights exception does not apply, and I think the MACA case makes that quite clear. Because there, as here, you have a past substantive decision that had been made. And the court held that Rule 19 barred the efforts to unwind that decision and reallocate the fishing quotas for that particular year. The only thing that the court said could proceed in the MACA case were prospective claims for injunctive relief about future decisions that the Secretary of Commerce would make in future years. So I think that shows the dividing line for the public rights exception in this sort of factual posture is that efforts to undo past decisions are barred, whereas perhaps an effort to seek prospective injunctive relief might be permissible. Thank you, counsel. Thank you. And with three minutes on the clock, Arden, sir, we'll give you your three minutes that you wanted to have. If it pleases the Court, my name is Dorothy Alther, and I'm here on behalf of the Kumeyaay Cultural Repatriation Committee. My argument is going to focus pretty narrowly on what the appellant has argued in their opening brief in terms of whether or not NAGPRA is a congressional waiver of tribal sovereign immunity. This is a very important argument, not just for this case, but could have repercussions in other cases as well. I think that the Supreme Court has made very, very clear that in order for there to be a congressional waiver of sovereign immunity, it must be unequivocal and expressed. If you look at NAGPRA and you look at Section 3013, which is what appellants are really kind of hanging their hat on as supporting this congressional waiver, there is nothing in 3013 that reference tribes or a waiver of their sovereign immunity. That being the case, what the Court basically then says is, well, was there an intent by Congress to actually waive that sovereign immunity? After doing a fairly thorough research on the legislative history of NAGPRA, specifically Senate Report 101-473, was really one of the very few sections that really dealt with 3013. And what the report basically said is that we're adding in 3013 for the purpose of when federal agencies, museums, and affected Indian tribes or Native American organizations cannot reach agreement regarding the appropriate disposition of Native American human remains. It says the committee finds that the federal court to be the forum for disputes between the parties regarding, one, regarding a determination of cultural affiliation, two, right of possession, three, the character of an article or object in the possession of the museum. Not one of those determinations are made by a tribe. They are all made either by the museum or by the federal government. So I think what the Senate report is saying is the disputes that we're setting 3013 up to here in federal court are going to be determinations that are being made by the museum or by the federal agency. Because the tribes are not making those determinations, it's clear that they were not intending to waive immunity for them to be sued, because there's nothing to sue them for. What, when you took the, when your clients took the action of filing a complaint on this matter, why doesn't that waive your sovereign immunity as to this case? Your Honor, there is compelling case law. I didn't bring it with me because I didn't expect that question. But merely filing a lawsuit, both with the federal government and a tribe, does not constitute a waiver of their sovereign immunity. Even to counterclaims that are brought by the defendant in a suit by a tribe. Yes, I recognize that. But this is a sort of unusual situation, because essentially you are asking for the same relief that the plaintiffs are. And I agree that separate and distinct counterclaims that do not go to the subject matter would be barred. But if the suit is merged, if it's joined, why do you think there's not a separate and distinct counterclaim that would go to the subject matter? In other words, if the suit were consolidated, why? Well, first, Your Honor, the case has been dismissed. Yes. But second of all. I was asking a hypothetical question. Oh, I'm sorry. Your Honor, I don't think that the two cases are asking for the same relief. Obviously, the professors would like to have the human remains stay with the university. Obviously, my client would like to see the human remains transferred to the tribe. However, how we get there is totally different. Okay? What the appellant is saying is that these are not Native American. Therefore, they're not subject to NAGPRA. And you say they are. We are saying that they are subject to NAGPRA. That's the central question of whether or not they are or they aren't would have been decided. I mean, let me put it this way. If there had been a contrary decision in the prior suit to this one on that question, we'd have a clear conflict. And that's precisely why we consolidate cases, to avoid inconsistent results. Like I said, Your Honor, when the injunction got released, when the injunction was issued in the case, in the White case, the university, the relief that we were seeking was now almost impossible, because if they were to, in fact, move forward with our case and transfer, they would be in contempt of court of the injunction. So we essentially placed the case on hold, pending an outcome of the White case. I've taken up enough of your time with the questions. Any further questions? Thank you for your argument. Thank you. We'll put three minutes on for rebuttal, equalize the time. I'd like to address the issue of sovereign immunity, which I didn't get to address in the first part of my argument. And I think this is an important issue here, because it allows this court to bypass the issue of Rule 19 balancing, if in fact it finds that the tribes and the KCRC are not entitled to sovereign immunity in this case. And I think, first, Judge Thomas, as you hit on this issue, a voluntary waiver by the KCRC filing an action relating to the exact same facts, the exact same set of remains, seeking the exact same determination by the court. And whether or not that case has at this point been dismissed, which is true, it certainly shows that the tribes, that that's their course of action in this case, would be to file another lawsuit. And presumably, if the university were to make a determination that the remains were not Native American, then the tribes could initiate suit again, like they had already. And by so doing, they would necessarily waive sovereign immunity? I think they would in this case. So they're in a situation where, in order to exercise their prerogatives, they are forced to go to court by what they think is a bad decision, but the rock in the hard place is that, therefore, they waive sovereign immunity? It's like personal jurisdiction. I mean, you don't waive jurisdictional by going to court to simply showing up in court and then arguing we shouldn't be here. Your Honor, I'm not stating that because they've showed up in this case that they have somehow waived sovereign immunity in this case. I'm suggesting that by filing a separate lawsuit seeking the exact same relief. So they should just sit there and do nothing, even though they think their interests are being disrespected by what's going on? Certainly not. They could join this lawsuit and put forth their perspective. They could. Right, but you can't compel them to. No, you're right. That's the point. And that's the issue we have here, but it creates the anomalous result that the Tenth Circuit realized in the Many Goats case, which is that it allows the tribe both to block unfavorable decisions from being reviewed, excuse me, blocks favorable decisions from their perspective from being reviewed by the court, but on the other hand, allows them to have the only jurisdiction to be able to challenge unfavorable results. And that's exactly the situation we have here. One of the foolish inconsistencies is the problem with small minds. I mean, sometimes that happens with sovereign immunity. And certainly there is Ninth Circuit precedent suggesting that sometimes sovereign immunity, you know, could outweigh other factors in this case. But in this case, the sovereign immunity that's implicated by this case is not the type of sovereign immunity that's implicated in other cases cited by appellants. A question about the Bonickson case. The other side says, look, if you look closely, you'll see that there's a killer word in there, and the killer word is shall, which differentiates that from this situation. Your response to that is? There's several quotes from the Bonickson case that I think relate directly to this, and that is in the district court held that though there is not an absolute obligation to allow particular scientists access to study, there is ample reason to believe that they should be under normal circumstances. And that's at 217 F sub second, and that's at 1166. And similarly, the district court goes on to say, permission to study does not depend on having been named in the permit to excavate or remove. Study is generally carried out without a permit. What I'm concerned about, among other things, is you seem to be opening the door to allow university professors to challenge everything by giving them standing with respect to academic decisions with which they disagree. Your Honor, that's beyond the scope of what we're asking in this case. We're simply asking for the university to make a determination as they're required by law to do under NAGPRA. And whether or not the university professors are able to challenge other determinations that the university makes depends on whether or not the university is legally required to make those determinations. Here, the university was legally required to make a determination as to whether the remains were Native American before they were placed on the 2008 Notice of Inventory Completion, before they were placed on the 2011 Notice of Inventory Completion, neither of which the university did. And that's the basis for the plaintiff's challenge here. It's not just a general administrative argument with the university. It's what's required by law. Thank you, counsel. Your time has expired. A very interesting case, well briefed and argued by all. And we will take it under submission.
judges: Trott, Thomas, Murguia